STATE OF NORTH CAROLINA v. NORRIS LEWIS WESTALL

No. 9329SC1070

(Filed 18 October 1994)

## 1. Robbery § 80 (NCI4th)— pellet gun dangerous weapon

A pellet gun may be a dangerous weapon *per se*, or at a minimum, such determination must be made upon a consideration of the instrument's use. In this case, there was clearly sufficient evidence to permit the jury to decide whether defendant committed robbery with a dangerous weapon or the lesser-included offense of common law robbery where the evidence tended to show that defendant placed the pellet gun into the victim's back, pointed directly at her kidney, and the projectile from such a pistol was capable of totally penetrating a quarter-inch of plywood and thus very likely would have resulted in a life-threatening injury to the victim had defendant fired the weapon.

**Am Jur 2d, Robbery §§ 62 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

## 2. Robbery § 116 (NCI4th)— dangerous weapon—jury instructions proper

The trial court's instructions defining "dangerous weapon" in a prosecution for armed robbery with a pellet gun were not confusing and erroneous because the court inadvertently omitted the word "death" from its pattern jury instruction that a weapon is dangerous when it is likely to cause serious bodily injury since serious bodily injury is synonymous with endangering or threatening life. Moreover, there could have been no doubt in any juror's mind that the pellet gun as used by defendant was dangerous only if it threatened or endangered the victim's life where the trial court, after giving the pattern instruction, gave an instruction requested by defendant that repeated three times the explicit requirement that a weapon must in fact be capable of

threatening or endangering life in order to be a dangerous weapon.

**Am Jur 2d, Robbery §§ 71 et seq.**

3. **Evidence and Witnesses § 2165 (NCI4th)— opinion testimony allowed—no objection to qualifications of witness**

In North Carolina, unless a party specifically objects to the qualification of the expert, a ruling permitting opinion testimony is tantamount to a finding by the trial court that the witness is qualified to state an opinion; furthermore, a defendant who does not object to the qualifications of the witness but merely objects to the content of the testimony waives the right to challenge the witness's qualification on appeal.

**Am Jur 2d, Expert and Opinion Evidence §§ 60 et seq.**

4. **Evidence and Witnesses § 2227 (NCI4th)— force of pellet gun—opinion testimony**

In a prosecution of defendant for robbery with a dangerous weapon, the trial court did not err in allowing a detective to state his opinion with respect to the force of the pellet gun used by defendant and the damage which could be caused by a projectile fired from it where that opinion was based on the detective's experience with firearms and their capabilities and on the detective's observation of the firing of a comparable pellet gun and the destructive force of this similar weapon.

**Am Jur 2d, Expert and Opinion Evidence §§ 303 et seq.**

5. **Evidence and Witnesses § 1782 (NCI4th)— defendant required to place stocking over head—no error**

The trial court did not err in requiring defendant to place over his head a stocking recovered from the car of his codefendant, since the demonstration was relevant to aid the jury in assessing the credibility of the victim's identification of defendant.

**Am Jur 2d, Evidence §§ 950 et seq.**

**Propriety of requiring criminal defendant to exhibit self, or perform physical act, or participate in demonstration, during trial and in presence of jury. 3 ALR4th 374.**

**6. Evidence and Witnesses § 2888 (NCI4th)— prosecutor's question of witness as to religious sincerity—door opened by defense—no error**

There was no error in the prosecution's questioning of a witness concerning the solemnity and sincerity with which he took the oath, including questions as to what the Bible meant to him and what significance swearing on the Bible had for him, since the defense had already opened the door to this line of inquiry.

**Am Jur 2d, Witnesses §§ 484 et seq.**

**7. Evidence and Witnesses § 867 (NCI4th)— no inadmissible hearsay allowed**

There was no merit to defendant's contention that the trial court allowed inadmissible hearsay into evidence, since one statement was offered for the non-hearsay purpose of impeaching defendant's brother and to explain conduct of investigating officers, and another statement merely confirmed what the jury had already heard.

**Am Jur 2d, Evidence §§ 658 et seq.**

**8. Evidence and Witnesses § 1070 (NCI4th)— flight of defendant—sufficiency of evidence to support instruction**

Evidence was sufficient to reasonably support an inference that defendant fled from the scene of the crime and later eluded police after a high-speed pursuit, and the mere fact that other evidence showed defendant later voluntarily surrendered to police did not render the instruction on flight erroneous.

**Am Jur 2d, Trial § 1184.**

**9. Criminal Law § 1105 (NCI4th)— sentence not enhanced by pending cases—no error**

Where the record did not affirmatively show that the trial court considered other charges pending against defendant in imposing the sentence in this case, the court on appeal does not find error.

**Am Jur 2d, Criminal Law §§ 525 et seq., 598, 599.**

Appeal by defendant from judgment entered 1 April 1993 by Judge Zoro J. Guice, Jr., in McDowell County Superior Court. Heard in the Court of Appeals 29 August 1994.

**STATE v. WESTALL**

[116 N.C. App. 534 (1994)]

Defendant was charged in a proper bill of indictment with one count of robbery with a dangerous weapon, to which he entered a plea of not guilty. The evidence presented by the State at trial may be briefly summarized as follows: On 13 July 1992, Michelle Reel was working as a clerk at Kehler's store, a convenience store located in McDowell County. Around 10:00 p.m. that night, two men came into the store and demanded that Ms. Reel give them the money in the cash register. Both men had their faces covered, one by a bandana, dark glasses, and a baseball cap and the other by a stocking placed over his head.

The man wearing the stocking pointed a pistol at Ms. Reel and demanded money. He walked up to her, pressed the pistol to her lower back in the area of her kidney, and marched her to the cash register. Ms. Reel was able to see through the stocking and was able to recognize defendant, with whom she had been previously acquainted. Defendant emptied the cash drawer, after which he and the other man both ran outside and behind the store to a waiting vehicle. Ms. Reel immediately summoned the police and identified defendant as the man wearing the stocking over his head.

Approximately two hours later, a detective with the sheriff's department passed an automobile matching the description of the getaway car. When the detective turned his car around to investigate, the suspect vehicle accelerated away from the officer. He gave chase, but lost sight of the car until he found it abandoned at the end of the road. The car was registered to Darrell Thomason, a friend and co-defendant of Norris Westall, and inside, the detective found a pair of stockings and dark glasses. With the help of bloodhounds, two sets of footprints were tracked from the car to defendant's older brother's mobile home, approximately one-and-a-half miles away. Sheriff's deputies searched the area, but neither Thomason nor defendant was discovered. A warrant was issued for defendant's arrest for robbery with a dangerous weapon.

The next day, a patron of the convenience store found a baseball cap and a pistol behind the store. Ms. Reel identified them as the ones used by the robbers. The recovered pistol was a Crossman .177 caliber pistol capable of firing either pellets or BBs at 450 feet per second.

Defendant testified in his own behalf. He admitted that he had been in the company of Thomason and a third co-defendant, John Minish, earlier on the afternoon preceding the robbery, but main-

tained that he had gone shopping in Hickory that evening with a friend, Holly Price. He and Ms. Price then went to Lake James and later went to defendant's father's house and watched a videotaped movie until they fell asleep after midnight. He denied having been near Kehler's store at anytime on the date of the robbery. On the following day when he heard that a warrant had been issued for his arrest, he went to the courthouse and turned himself in.

Defendant and Thomason were tried jointly. The jury was instructed as to both robbery with a dangerous weapon and the lesser included offense of common law robbery. The jury found defendant guilty of robbery with a dangerous weapon. The trial court entered judgment upon the verdict, sentencing defendant to an active term of imprisonment for forty years. Defendant appealed.

*Attorney General Michael F. Easley, by Associate Attorney General William McBlief, for the State.*

*C. Frank Goldsmith, Jr., for defendant-appellant.*

MARTIN, Judge.

Defendant contends the trial court erred by submitting the charge of robbery with a dangerous weapon to the jury, in its rulings with respect to the admission of certain evidence, in its instructions to the jury, and by sentencing defendant to the maximum term of imprisonment allowed by law. We find no prejudicial error in defendant's trial.

I.

[1] Defendant's first assignment of error results from his claim that the pellet gun used in the robbery cannot be considered a dangerous weapon. G.S. § 14-87(a) defines the offense of robbery with a dangerous weapon as the unlawful taking, or attempted taking, of personal property while "having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, *whereby the life of a person is endangered or threatened.*" (Emphasis added.) Our Supreme Court has ruled that for a weapon to be considered dangerous under this statute, "the determinative question is whether the evidence was sufficient to support a jury finding that a person's *life* was in fact endangered or threatened." (Emphasis original.) *State v. Alston*, 305 N.C. 647, 650, 290 S.E.2d 614, 616 (1982). The rules for making the above determination were summarized in *State v. Allen*, 317 N.C. 119, 124-25, 343 S.E.2d 893, 897 (1986).

The rules are: (1) When a robbery is committed with what appeared to the victim to be a firearm or other dangerous weapon capable of endangering or threatening the life of the victim and there is no evidence to the contrary, there is a mandatory presumption that the weapon was as it appeared to the victim to be. (2) If there is some evidence that the implement used was not a firearm or other dangerous weapon which could have threatened or endangered the life of the victim, the mandatory presumption disappears leaving only a permissive inference, which permits but does not require the jury to infer that the instrument used was in fact a firearm or other dangerous weapon whereby the victim's life was endangered or threatened. (3) If all the evidence shows the instrument could not have been a firearm or other dangerous weapon capable of threatening or endangering the life of the victim, the armed robbery charge should not be submitted to the jury.

Defendant contends that the armed robbery charge should not have been submitted to the jury because there was insufficient evidence that the pellet gun used during the robbery was actually capable of threatening or endangering Ms. Reel's life. We disagree.

We must look at the circumstances of use to determine whether an instrument is capable of threatening or endangering life. *State v. Pettiford*, 60 N.C. App. 92, 298 S.E.2d 389 (1982). In *State v. Joyner*, 295 N.C. 55, 243 S.E.2d 367 (1978), the Supreme Court found a soda bottle to be a sufficiently deadly weapon for a jury to consider a charge of assault with a deadly weapon and noted that "where the instrument, according to the manner of its use or *the part of the body at which the blow is aimed,* may or may not be likely to produce such results, its allegedly deadly character is one of fact to be determined by the jury." (Emphasis added.) *Id.* at 64-65, 243 S.E.2d at 373. This same analysis may be used in determining whether an instrument is a dangerous weapon for armed robbery. *State v. Rowland*, 89 N.C. App. 372, 366 S.E.2d 550 (1988).

A pellet gun was found to be a deadly weapon *per se* in *Pettiford, supra,* where the defendant fired the pistol at close range in the victim's face. This caused a metal fragment to lodge in the victim's skull, leaving behind an entry wound and a large bruise. Despite the fact that the victim never lost consciousness, remained fully lucid, and suffered no impairment as a result of the injury, this Court found the

**STATE v. WESTALL**

[116 N.C. App. 534 (1994)]

use of the pellet gun constituted a deadly weapon *per se* to uphold the assault with a deadly weapon conviction.

In *State v. Alston, supra,* an accomplice admitted on direct examination that the gun he used was a pellet rifle, while on cross-examination, he called it a BB rifle. Our Supreme Court distinguished the weapons by concluding that the evidence the rifle

> was a Remington pellet gun was sufficient to support a jury finding that the [l]ives of the victims here in fact were endangered or threatened by his possession, use or threatened use of the rifle. The testimony . . ., on the other hand, that the rifle was a BB rifle constituted affirmative evidence to the contrary and indicated that the victims' lives were not endangered or threatened in fact by his possession, use or threatened use of the rifle.

*Alston,* 305 N.C. at 650-51, 290 S.E.2d at 616. The Supreme Court found this evidence created only a permissive inference, allowing the jury to decide whether the instrument threatened or endangered life, and thus, required the instruction on the lesser included offense of common law robbery should the jury reject the inference of the gun's dangerous properties.

Defendant relies upon *State v. Summey,* 109 N.C. App. 518, 428 S.E.2d 245 (1993) to support his position that pellet guns, as a matter of law, are not dangerous weapons. His reliance on *Summey* is misplaced. In *Summey,* we simply reiterated the principle that contrary evidence as to the dangerous properties of weapons used in a robbery requires that the jury be instructed as to the question of a defendant's guilt of common law robbery in addition to robbery with a dangerous weapon. We expressly disavow any interpretation of our opinion in *Summey* as standing for the proposition that a pellet gun is not, as a matter of law, a dangerous weapon. We continue to follow prior holdings, specifically those set forth in *Alston and Pettiford, supra,* that a pellet gun may be a dangerous weapon *per se,* or at a minimum, that such a determination must be made upon a consideration of the instrument's use.

Defendant placed the pellet gun into the clerk's back, pointed directly at her kidney. Taken in the light most favorable to the State, the evidence showed the projectile from such a pistol was capable of totally penetrating a quarter-inch of plywood, and, thus, very likely would have resulted in a life-threatening injury to Ms. Reel had defendant fired the weapon. From the manner in which the pellet gun

was used, there was clearly sufficient evidence to permit the jury to decide whether defendant committed robbery with a dangerous weapon or the lesser included offense of common law robbery.

[2] By a separate assignment of error, defendant further contends that the jury instructions defining "dangerous weapon" were confusing, contradictory, and erroneous. We disagree. The instructions defining "dangerous weapon" were discussed in the jury instruction conference, and the court's offer to give the defendant's requested instruction as to the definition of a dangerous weapon immediately following that contained in the pattern jury instruction was agreed to by defendant's counsel.

The trial court instructed the jury, as suggested in NCPI Crim. 217.30, that "[a] dangerous weapon is a weapon which is likely to cause [sic] or serious bodily harm" and that serious bodily injury "is one which causes great pain and suffering." Although the court apparently omitted the word "death" through inadvertence, the instruction was not error. The use of a dangerous weapon need not result in death, but the instrument itself must merely be capable of taking life in the manner that it was used. Instructing the jury that a weapon is dangerous when it is likely to cause death or serious bodily injury does not lower the standard for determining what is a dangerous weapon, as any instrument capable of causing serious bodily injury could also cause death depending on its use. *See Joyner, supra.* In our view, serious bodily injury is synonymous with endangering or threatening life. Thus, the trial court's instruction as to the definition of serious bodily injury was appropriate to aid the jury in determining if the instrument was likely to cause death or serious bodily injury, and, therefore, to endanger or threaten life.

Moreover, the instruction requested by defendant and given by the trial court repeated three times the explicit requirement that a weapon must in fact be capable of threatening or endangering life in order to be a dangerous weapon, further assuring us that there could have been no doubt in any juror's mind that the pellet gun used by defendant was dangerous only if it threatened or endangered the victim's life. These assignments of error are overruled.

## II.

By his next assignment of error, defendant asserts that the trial court erred in allowing Detective Robert Smith to state his opinion with respect to the force of the pellet gun and the damage which

could be caused by a projectile fired from it. We find no error in the trial court's decision to allow the testimony.

**[3]** Defendant first argues that the testimony of Detective Smith should have been excluded since the witness was never qualified as an expert. This is not the rule in North Carolina. Our Supreme Court commented on this issue in *State v. Aguallo*, 322 N.C. 818, 821, 370 S.E.2d 676, 677 (1988).

> In considering this assignment of error, we find instructive this Court's decision in *State v. Phifer*, 290 N.C. 203, 225 S.E.2d 786 (1976). There, the defendant objected to the trial judge's decision to allow into evidence the testimony of two SBI agents. One agent gave his opinion as to whether the washing of one's hands would destroy any possibility of a valid gun residue test, and a second agent explained the differences between a latent lift and a fingerprint. Neither of the agents had been formally qualified as experts. We held that because of the nature of their jobs and the experience which they had, they were better qualified than the jury to form an opinion on these matters. *Id.* at 213, 225 S.E.2d at 793. The Court further held that because the defendant never requested a finding by the trial court as to the witnesses' qualifications as experts, such a finding was deemed implicit in the ruling admitting the opinion testimony. *Id.* at 213-14, 225 S.E.2d at 793.

Thus, in North Carolina, unless a party specifically objects to the qualification of the expert, a ruling permitting opinion testimony is tantamount to a finding by the trial court that the witness is qualified to state an opinion.

> Furthermore,

> "An objection to a witness's qualifications as an expert in a given field or upon a particular subject is waived if it is not made in apt time upon this special ground, and a mere general objection to the content of the witness's testimony will not ordinarily suffice to preserve the matter for subsequent review." The defendant merely made a general objection to the testimony which is the subject of this assignment. Therefore, any objection to the witness testifying as an expert was waived, and the assignment is overruled.

*State v. Riddick*, 315 N.C. 749, 758, 340 S.E.2d 55, 60 (1986), citing *State v. Hunt*, 305 N.C. 238, 243, 287 S.E.2d 818, 821 (1982). "In the

absence of a special request to qualify a witness as an expert, a general objection to specific opinion testimony will not suffice to preserve the question of the expert's qualifications, even on ultimate issues." *State v. Hamilton*, 77 N.C. App. 506, 509, 335 S.E.2d 506, 508-09 (1985), *disc. review denied*, 315 N.C. 593, 341 S.E.2d 33 (1986). Defendant did not object to the qualifications of the witness, but merely objected to the content of the testimony related to specific knowledge of the pellet gun involved in the case. Defendant waived the right to challenge the witness's qualification on appeal.

[4] As an expert, Detective Smith did not testify as to any experiments he conducted inside or outside of the courtroom. Rather, he testified as to the basis of his opinion on the force of a pellet fired from the gun and the damage it could cause to the human body. Provided that the opinion is based on adequate facts and data, reasonably relied upon by experts in the particular field, such testimony regarding the basis for an expert's opinion is admissible, though not as substantive evidence. N.C. Gen. Stat. § 8C-1, Rule 703, Commentary. Detective Smith observed the firing of a comparable pellet gun and witnessed the destructive force of this similar weapon. This observation, coupled with his experience with firearms and their capabilities, adequately provided Detective Smith with sufficient facts and data on which he could reasonably rely in forming his expert opinion. He concluded that the pellet gun used at point-blank range was a life-threatening weapon, and we find no error in the admission of his opinion testimony.

III.

[5] Defendant next assigns as error the trial court's requiring defendant to place over his head a stocking recovered from the car of his co-defendant. Defendant claims the procedure was an experiment erroneously admitted because it was not conducted under circumstances reasonably similar to those existing at the time of the robbery. We disagree.

The demonstration with the stocking was not an experiment requiring substantially similar circumstances. Citing *State v. Hunt*, 80 N.C. App. 190, 341 S.E.2d 350 (1986), our Supreme Court explained:

> In *Hunt*, Judge Becton, writing for the panel, made a distinction between a demonstration and an experiment. He defined a demonstration as "an illustration or explanation, as of a theory or product, by exemplification or practical application." He defined

an experiment as "a test made to demonstrate a known truth, to examine the validity of a hypothesis, or to determine the efficacy of something previously untried." [Citation omitted.] We believe the evidence challenged by this assignment of error is more in the nature of a demonstration than an experiment. We agree with Judge Becton that the test of the admissibility is as set forth in N.C.G.S. 8C-1, Rule 403. If the evidence is relevant it will be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury.

*State v. Allen*, 323 N.C. 208, 225, 372 S.E.2d 855, 865 (1988), *vacated on other grounds*, 494 U.S. 1021, 108 L.Ed.2d 601 (1990), *judgment reinstated*, 331 N.C. 746, 417 S.E.2d 227 (1992), *cert. denied*, ___ U.S. ___, 122 L.Ed.2d 775 (1993). The demonstration here was factually similar to demonstrations addressed in *State v. Perry*, 291 N.C. 284, 230 S.E.2d 141 (1976) and *State v. Suddreth*, 105 N.C. App. 122, 412 S.E.2d 126, *disc. review denied*, 331 N.C. 281, 417 S.E.2d 68 (1992). In both cases, no error was found in requiring the defendants to place masks over their heads, when there was a question before the jury as to whether the victims were able to identify the defendants. We hold the demonstration was relevant to aid the jury in assessing the credibility of the store clerk's identification of defendant.

Moreover, we hold that the danger of unfair prejudice to defendant in the present case did not outweigh the probative value of the demonstration. In fact, in the present case, the demonstration may actually have benefitted defendant. His initial efforts to place the stocking over his head tore the first stocking, supporting his testimony that it would not fit over his head. When the prosecutor gave defendant the second stocking and admonished him for his rough treatment of the first stocking, defendant said, "Do you want to put it on for me? I've never put one on before." In addition, the trial court promptly instructed the jury to disregard the victim's unsolicited indication that she recognized defendant through the stocking. This assignment of error is overruled.

IV.

[6] Defendant's fourth assignment of error concerns the cross-examination of a witness regarding his religious beliefs. Defendant argues that it was error for the trial court to allow the prosecutor to question the witness's religious sincerity. We disagree.

G.S. § 8C-1, Rule 603 provides that "[b]efore testifying, every witness shall be required to declare that he will testify truthfully, by oath or affirmation administered in a form calculated to awaken his conscience and impress his mind with his duty to do so." At trial, John Minish, originally a third co-defendant, took the stand after being administered the oath, and proceeded to deny the truth of an earlier statement he had made to the police implicating himself and defendant in the armed robbery. Under oath, he claimed that he had lied to the police and had not been with defendant at the time of the robbery.

In an attempt to bolster the credibility of this witness for the defense, on cross-examination defendant's counsel questioned the witness as to why he had lied earlier and was now telling the truth. Specifically, the witness was asked what the Bible meant to him and what significance swearing on the Bible had for him. The witness replied that he had not been under oath earlier, and that swearing on the Bible meant a great deal to him. Subsequently, during re-direct examination by the prosecutor, the witness was questioned regarding the sincerity of his oath taking, and the witness admitted he did not claim to be a Christian nor did he attend church, but he maintained that swearing on the Bible had significance for him.

Despite the prohibition in G.S. § 8C-1, Rule 610 that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced," there was no error. By questioning the sincerity and solemnity with which the witness took the oath, the defense exposed the witness to the same inquiry by the prosecution. We find there was no error in the prosecution's questioning of the witness because the defense had already "opened the door" to this line of inquiry. *See State v. Shamsid-deen*, 324 N.C. 437, 379 S.E.2d 842 (1989).

V.

Defendant next assigns error to the admission of out-of-court statements made by two of the State's witnesses to Detective Smith. The statements were admitted to corroborate the witnesses' in-court testimony. Defendant contends that the out-of-court statements varied materially from the witnesses' testimony and, therefore, were inadmissible. His arguments have no merit.

First, defendant argues that when Detective Smith testified that the victim, Ms. Reel, had told him she was 99.9% certain of the identi-

ty of one of the robbers, this was in material variance with Ms. Reel's own testimony that she was 99% certain. However, Ms. Reel's statements as to her certainty could only have been figures of speech meant to express a near total certainty, not an exact percentage as defendant argues. Certainly, among statisticians, there is a great material variance between 99% and 99.9%. However, it is ludicrous to maintain that a store clerk reporting a crime, and later testifying in court, should be held to the same standard of materiality. The officer's testimony was corroborative, and it was not error to admit it.

Defendant next argues that it was error to allow Detective Smith to testify as to a prior statement implicating defendant made by witness John Minish. Defendant cites as authority our Supreme Court's decision in *State v. Hunt*, 324 N.C. 343, 378 S.E.2d 754 (1989). In *Hunt*, the witness denied having ever made the earlier statement, and an officer's testimony to the contrary could, therefore, not be considered corroboration. Here, witness Minish never denied making the statement to police implicating defendant in the robbery. Rather, Minish testified in court that he made the earlier statement, but that it had been a lie. The officer's testimony corroborated Minish's testimony concerning the earlier statement. *See State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493 (1984). We find no error.

## VI.

Defendant's sixth assignment of error is that the trial court erred in allowing Detective Smith to tell the jury why he believed witness Minish was more involved in the robbery than Minish had admitted to the police in the earlier interview. We disagree.

On cross-examination, defendant established that Detective Smith, contrary to his usual procedure, had made no notes during or after Minish's interview. On re-direct, the prosecutor asked him to explain this departure from custom, and Detective Smith responded that he had thought Minish was lying, and explained that his interview of Minish's sister led him to doubt Minish's pretrial statement. G.S. § 8C-1, Rule 701 provides that

> [i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

STATE v. WESTALL

[116 N.C. App. 534 (1994)]

Detective Smith expressed a lay opinion that he did not believe Minish, and this opinion was rationally based on his own firsthand knowledge and observations. This opinion was helpful to explain his earlier testimony, specifically as to why no notes were taken during the police interview, and was properly admissible under Rule 701. *See State v. Rhinehart*, 322 N.C. 53, 366 S.E.2d 429 (1988).

## VII.

Defendant next assigns as error the trial court's permitting the prosecutor to question a defense witness about facts allegedly not in evidence. Defendant contends the prosecutor assumed a fact not in evidence when he asked defendant's alibi witness, Holly Price, if she knew that an officer had been to defendant's father's home during the time she claimed to have been there with defendant. However, Detective Smith testified that an officer had been sent to the father's residence, where both defendant and Ms. Price claimed to have been. Ms. Price stated that she and defendant returned to the home between 11:00 p.m. and 12:00 p.m., perhaps as early as 11:00 p.m. Detective Smith stated that he sent an officer to the residence sometime after his arrival on the scene of the robbery at 10:45 p.m. The officer was unable to find defendant at the home and returned to the store. Upon his return, he and Detective Smith drove to Thomason's residence and then to Minish's residence before encountering the vehicle matching the description of the getaway car, approximately at midnight. The above facts were all in evidence at the time the prosecutor asked the alibi witness if she knew an officer had looked for defendant at the location and time of the alibi offered by the witness. The trial court committed no error in allowing this question to be asked of the witness.

## VIII.

[7] Defendant's eighth assignment of error is that the trial court allowed inadmissible hearsay into evidence. Defendant first argues that the trial court erred when it permitted defendant's brother, Larry Westall, and Detective Scott Hollifield to testify concerning Larry's prior out-of-court statement to the detective. We disagree.

On direct examination, Larry Westall testified that he had told officers who were searching for defendant in Larry's trailer that they might find defendant at his father's house, but that the officers had seemed uninterested in the directions to his father's house. On cross-examination, the prosecutor asked Larry if he had told Detective

Hollifield that defendant's father had said that defendant had come to his house around 10:30 p.m. and asked to borrow his car, that defendant's father had refused to give it to him, and that defendant had left. Larry Westall denied making any such statement. In rebuttal, Detective Hollifield testified that Larry had made such a statement in his presence. The trial court properly admitted the prior inconsistent statement for the non-hearsay purpose of impeaching Larry.

In *State v. Green*, 296 N.C. 183, 192-93, 250 S.E.2d 197, 203 (1978), our Supreme court addressed this exact issue.

A witness may be cross-examined by confronting him with prior statements inconsistent with any part of his testimony . . . . If the matters inquired about are collateral, but tend "to connect him directly with the cause or the parties" or show his bias toward either, the inquirer is not bound by the witness's answer and may prove the matter by other witnesses, but not before he has confronted the witness with his prior statement so that he may have an opportunity to admit, deny or explain it. (Citations omitted.)

The court further stated that impeachment of an alibi witness "respected the main subject matter in regard to which such witnesses were examined, namely, the whereabouts of the defendant at the time the offense is alleged to have been committed." *Id.* at 194, 250 S.E.2d at 204. Whether or not Larry's testimony can be considered an alibi, his "close connection" to the defendant allows for extrinsic evidence to be used in impeaching his testimony, despite being a collateral matter. Thus, it was not error to allow testimony concerning Larry's prior out-of-court statement.

The fact that Larry's statement itself contained a statement by defendant's father did not render Larry's statement inadmissible. The father's statement, relayed by Larry, explained why the deputies did not subsequently look for defendant at the father's house. Such use does not constitute hearsay. "[T]here was no hearsay—within—hearsay problem presented here because the statements of the third party declarants were not offered for their truth, but to explain the officer's conduct." *State v. Harper*, 96 N.C. App. 36, 40, 384 S.E.2d 297, 299 (1989). Statements of one person to another are admissible to explain the subsequent conduct of the person to whom the statement was made. *State v. White*, 298 N.C. 430, 259 S.E.2d 281 (1979). Larry's prior statement to the deputy was not offered to prove the

STATE v. WESTALL

[116 N.C. App. 534 (1994)]

truth of the matter asserted, but rather to explain the officers' actions, and was, therefore, not hearsay.

Defendant also contends it was error for the trial court to allow Detective Hollifield to testify that he had heard a dog handler's in-court statement regarding the officers securing the scene around the abandoned getaway car before using the bloodhounds to track the footprints. The dog handler had previously been cross-examined by defendant's counsel concerning the presence of officers at the scene before the tracking dogs had arrived. Detective Hollifield's testimony was not offered for the truth of the matter asserted, but merely acknowledged that the deputy had heard the testimony. In any event, the statement could not have prejudiced the defendant since the dog handler had testified immediately prior to the deputy, and the jury had already heard the testimony concerning the officers' actions at the abandoned vehicle and in tracking the footprints to Larry Westall's mobile home. We find no error.

IX.

[8] Defendant's next assignment of error is that the trial court erred in instructing the jury with respect to evidence of flight. Defendant is correct that mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension. However, there need only be "some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged." *State v. Levan*, 326 N.C. 155, 164-65, 388 S.E.2d 429, 434 (1990). Defendant contends that because he voluntarily surrendered himself to the police upon learning of a warrant for his arrest there was no evidence of flight. We disagree.

Sufficient evidence of defendant's flight existed to warrant an instruction to the jury on this point, notwithstanding defendant's voluntary surrender. After the perpetrators left the scene of the robbery, an officer attempted to stop an automobile matching the description of that used by the robbers. A high speed chase ensued and the suspects' getaway car was abandoned. Three sets of footprints led from the abandoned vehicle, two of which were tracked with bloodhounds through the woods to defendant's brother's mobile home. The officers were unable to locate defendant at home that night. This evidence is sufficient to reasonably support an inference that defendant fled from the scene of the crime, and later eluded police after a high-speed pursuit, thus taking additional steps to avoid apprehension. The mere

fact that other evidence showed defendant later voluntarily surrendered to police does not render the instruction erroneous. *See State v. Jenkins*, 57 N.C. App. 191, 291 S.E.2d 268 (1982).

. X.

**[9]** Defendant's final assignment of error is that the trial court erred or abused its discretion in sentencing defendant to the maximum term of forty years for robbery with a dangerous weapon. Defendant argues that the trial judge considered other charges pending against defendant when imposing the sentence in this case and this constituted error. Alternatively, he contends that the trial court abused its discretion by imposing the maximum sentence upon a nineteen-year-old whose prior criminal record consisted only of two misdemeanors.

It is well established that a trial judge may not consider, when imposing a sentence, other charges pending against a defendant for which he has not been convicted. In the present case, during colloquy with defendant's counsel, the trial court referred to the fact that several other charges, some of which arose after defendant had been released on bond for the present charge, were pending against defendant. However, the trial judge expressly stated that he was not considering the pending charges in sentencing defendant for the robbery conviction. We have had occasion to consider this issue under similar circumstances.

[T]he sentencing court may never enhance defendant's presumptive sentence merely because defendant has charges for other crimes pending against him.

Nevertheless, we uphold the trial court's sentencing in the instant case since the record does not affirmatively disclose the court enhanced defendant's sentence based on any consideration of his pending charges. Instead, the trial court's statements merely indicate it was aware of defendant's pending charges, not that it found or even considered them a factor aggravating defendant's sentence. Therefore, the sentencing court's statements regarding defendant's other pending charges do not themselves necessitate resentencing. (Citations omitted.)

*State v. Mack*, 87 N.C. App. 24, 31, 359 S.E.2d 485, 490 (1987), *disc. review denied*, 321 N.C. 477, 364 S.E.2d 663 (1988). The record does not affirmatively disclose that the trial court enhanced defendant's sentence due to the pending cases, and we decline to find error.

We also decline to hold that the trial judge abused his discretion in imposing the sentence in this case. The trial judge may be reversed for abuse of discretion only upon a showing that his ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision. *State v. Shoemaker*, 334 N.C. 252, 432 S.E.2d 314 (1993). It is not the role of an appellate court to substitute its judgment for that of the sentencing judge as to the appropriate length of the sentence. *State v. Aldridge*, 76 N.C. App. 638, 334 S.E.2d 107 (1985).

> [S]o long as the punishment rendered is within the maximum provided by law, an appellate court must assume that the trial judge acted fairly, reasonably and impartially in the performance of his office. Furthermore, when the sentence imposed is within statutory limits it cannot be considered excessive, cruel or unreasonable. (Citations omitted.)

*State v. Conard*, 55 N.C. App. 63, 67, 284 S.E.2d 557, 559-60 (1981), *disc. review denied*, 305 N.C. 303, 290 S.E.2d 704 (1982).

Defendant received a fair trial, free from prejudicial error.

No error.

Chief Judge ARNOLD and Judge THOMPSON concur.